**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**CLARYTONA MANOR, INC., Respondent.**

No. 72–1168.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 13, 1973.

Decided May 24, 1973.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Joseph E. Mayer, Atty., N.L.R. B., Washington, D. C., for petitioner.

George J. Matkov, Jr., William R. Sullivan, Jr., Chicago, Ill., for respondent.

Before FAIRCHILD and PELL, Circuit Judges, and CAMPBELL, Senior District Judge.*

PELL, Circuit Judge.

In May 1971, the Illinois Council of County and Municipal Employees Local Union No. 44, affiliated with the American Federation of State, County and Municipal Employees, AFL–CIO (the Union) filed an unfair labor practice charge with the National Labor Relations Board. The Union alleged that Clarytona Manor, Inc. (Clarytona), an Illinois corporation that operates nursing home facilities at Lewiston, Illinois, refused to bargain with the Union, in violation of section 8(a)(5) and (1) of the National Labor Relations Act, 29 U. S.C. § 151 et seq. The month before, over Clarytona's objections, the Board had certified the Union as the exclusive collective bargaining representative of an appropriate unit of Clarytona's employees. In response to the Union's charge, the Board's General Counsel issued a complaint against Clarytona and moved for summary judgment. The Board granted that motion and now

---

* Senior Judge William J. Campbell of the Northern District of Illinois is sitting by designation.

seeks enforcement of its order issued on August 19, 1971,[1] requiring Clarytona to cease and desist from its unfair labor practices and, upon request, to bargain collectively with the Union.

It is undisputed that Clarytona has refused to bargain with the Union. The primary issue here, as in the prior administrative proceedings, is whether the Board should have set aside the representation election held on November 20, 1970, because of allegedly improper campaign conduct by the Union.[2] The Union had won that election by a vote of 36 to 25. A secondary issue is whether Clarytona had presented substantial and material factual issues warranting a hearing.

I

Shortly before the election, on November 18 and 19, the Union had distributed two leaflets to Clarytona's employees. The leaflet distributed on November 18th clearly displays the Union's name at the top. Just below the name is what the Board accurately characterizes as "obvious campaign propaganda and an appeal for votes for the Union." The challenged portion of the flyer is as follows:

ILLINOIS COUNCIL OF COUNTY AND MUNICIPAL EMPLOYEES LOCAL UNIONS NO. 44 AFFILIATED WITH AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO

YES

OUR U. S. GOVERNMENT AGREES - " UNIONS ARE GOOD "

" It shall be the policy of the Congress of the United States to encourage collective bargaining (National Labor Relations Act -1947).

WHERE DOES THIS LEAVE CLARYTONA MANAGEMENT ? ? ? ? ? ? ?

ISSUED BY: The Clarytona Workers Organizing Committee AFSCME AFL-CIO

---

1. The Board's order is reported at 192 NLRB No. 114 (1971).

2. After the election, Clarytona had filed objections to certain conduct by the Union which allegedly had affected the election results. The Board's Regional Director thereupon conducted an investigation and recommended that the employer's objections be overruled in their entirety. He made these findings without resort to an evidentiary hearing. Subsequently, Clarytona filed timely exceptions to the Regional Director's report and recommendations; Clarytona reasserted its objections to the election and requested that the election be set aside or, in the alternative, that "the minimum relief the Board must provide . . . is a hearing." On April 2, 1971, after considering the objections, the Regional Director's report, and Clarytona's exceptions thereto, the Board adopted, without a hearing, the Regional Director's findings, conclusions, and recommendations and certified the Union as the exclusive bargaining representative.

The customary wording on the National Labor Relations Board ballot, "OFFICIAL SECRET BALLOT," does not appear nor do the words "National Labor Relations Board." Further, the customary question "Do you wish to be represented for purposes of collective bargaining by—" is lacking, leaving the simplified, suggestive ballot form in the flyer ambiguously consistent with either rejecting or desiring the designated Union.

The November 19th flyer is entitled "Union News" and states, *inter alia:*

"It's a fact that 90% plus of collective bargaining negotiations result in a settlement without a work stoppage. It is a fact that the Federal Government has an agency called the National Labor Relations Board that assists Labor and Management in reaching agreements. In fact it is the National Labor Relations Board (NLRB) that will be conducting the election on Friday and this NLRB office is headquartered in Peoria."

Further on, the flyer quotes statements generally supportive of collective bargaining and the labor movement attributed to several church organizations and leaders. It concludes with the following:

"Some famous leaders of our Country have made note as follows:

ABRAHAM LINCOLN—'If a man tells you he loves America, yet hates labor he is a liar.'

DWIGHT D. EISENHOWER—'Only a handful of unreconstructed reactionaries harbor the ugly thought of breaking unions and of depriving working men or working women of the right to join the union of their choice.'

FRANKLIN D. ROOSEVELT—'If I were a worker, the first thing I would do would be to join a union.' "

Clarytona argues that the simulated ballot in the November 18th handbill violated the Board's rule, as enunciated in Allied Electric Products, Inc., 109 NLRB 1270 (1954), against the reproduction of official Board documents altered to appear to favor one party in an election. The use of the ballot allegedly was a sufficient basis for setting aside the results of the election. Alternatively, with reference to the portions of the leaflets we have quoted above, Clarytona asserts that they are "blatant and unambiguous . . . direct and indirect statements implying governmental preference" for the Union and would independently warrant setting aside the election. Also, some of the statements supposedly are gross misrepresentations of fact. Furthermore, if the ballot and the objectionable statements are considered together, they allegedly mandate the setting aside of the election results.

II

As we pointed out in Rockwell Mfg. Co., Kearney Div. v. NLRB, 330 F.2d 795, 796 (7th Cir. 1964), cert. denied, 379 U.S. 890, 85 S.Ct. 161, 13 L. Ed.2d 94, "Whether to set aside an election because of incidents during the campaign period is a matter for the sound discretion of the Board." See also NLRB v. A. J. Tower Co., 329 U.S. 324, 330–331, 67 S.Ct. 324, 91 L.Ed. 322 (1946). Clarytona apparently is arguing that the Board committed two errors: it abused its discretion in April 1971, when it upheld the Regional Director's overruling of Clarytona's objections to the election and certified the Union (see footnote 2 of this opinion); and it further abused its discretion by refusing, in ruling on the General Counsel's motion for summary judgment in August 1971, to reexamine the decision it had made in April.[3] A refusal to

3. In its order of August 19, 1971, the Board summarized Clarytona's defense to the complaint lodged against it and concluded that the employer was seeking to relitigate the same issues the Board had considered and resolved against Clarytona when the

bargain is not a violation of the Act if the Board has acted improperly in certifying the union as a statutory bargaining representative. *See* NLRB v. Krieger-Ragsdale & Co., Inc., 379 F. 2d 517 (7th Cir. 1967), cert. denied, 389 U.S. 1041, 88 S.Ct. 780, 19 L.Ed.2d 831; Macomb Pottery Co. v. NLRB, 376 F.2d 450, 452 (7th Cir. 1967). The party challenging the validity of an election— Clarytona here—bears the burden of establishing that the Board abused its discretion. NLRB v. Mattison Machine Works, 365 U.S. 123, 124, 81 S.Ct. 434, 5 L.Ed.2d 455 (1961); NLRB v. Red Bird Foods, Inc., 399 F.2d 600, 602 (7th Cir. 1968).

In *Allied Electric Products, Inc., supra,* upon which Clarytona relies, the Board created an exception to the general rule that the Board does not " 'police or censor propaganda used in the elections it conducts, but rather leaves to the good sense of the voters the appraisal of such matters . . . .' " Linn v. United Plant Guard Workers, 383 U.S. 53, 60, 86 S.Ct. 657, 662, 15 L.Ed.2d 582 (1966). The union in *Allied Electric Products* had circulated a document that purported to be a sample copy of the Board's "Official Secret Ballot" as shown on the Board's notice of election. The sample ballot had, however, been altered: (1) the word "Yes" was printed in large type at the left of the "Yes" box; (2) there was an "X" in the "Yes" box; and (3) an additional statement had been added at the bottom of the ballot and read: "Do not mark it any other way—Mark 'YES' box only." The Board concluded that the sample ballot exceeded the bounds of legitimate campaign propaganda because it tended to suggest that the Board was not impartial but instead favored a particular choice in the upcoming election. The Board then declared that:

"in the future [the Board] will not permit *the reproduction of any document purporting to be a copy of the Board's official ballot,* other than one completely unaltered in form and content and clearly marked sample on its face, and upon objection validly filed, will set aside the results of any election in which the successful party has violated this rule." 109 NLRB at 1272 (footnotes omitted) (emphasis added).

The Board's discussion in *Allied Electric Products* and its subsequent application of the rule of that case convince us that the initial basis for finding *Allied* to be germane is the distribution of material which is a replica or a suggestive facsimile of an official Board document. While the thought might be ventured that the likelihood is rather minimal of most laboring people today being fooled by the use of copies of official documents into thinking that the Board is thereby expressing approval of one party or the other, and while the *Allied* rule would seem arguably not to pay proper deference to the native intelligence of people and their intuitive ability to discern deception such as this would be, nevertheless, we cannot quarrel with the genuine concern of the Board even with the appearance of the misuse of its processes to secure partisan advantage.

Accepting then the *Allied* rule as based on sound policy, we find the initial prong for activation of the rule missing. Although the Board in its brief did refer to the material in question as a "prototype ballot," we conclude here that not only did the reproduction not purport to be an official Board ballot, but a comparison between the handbill's simple, rather sketchy ballot with the official form reveals so many differences that it is unreasonable to assume

Board had decided in April 1971 to certify the Union as the exclusive bargaining representative. The Board then stated:
"[T]he Respondent does not offer to adduce at a hearing any newly discovered or previously unavailable evidence, nor does it allege that any special circum-

stances exist herein which would require the Board to reexamine the decision made in the representation proceeding. We therefore find that the Respondent has not raised any issue which is properly litigable in this unfair labor proceeding."

that the former could be mistaken for the latter.

█ Unlike the ballot in *Allied Electric Products*, the one here did not convey the impression that the Board was endorsing the Union. It .was at most "a graphic admonition to vote for a particular participant, without any implication of Board approval." Phelps-Dodge Copper Products Corp., 111 NLRB 950, 951 (1955). The Board's determination comports with such prior decisions as Houston Shell and ·Concrete Div., McDonough Co., 118 NLRB 1511, 1512 (1957); Paula Shoe Co., Inc., 121 NLRB 673, 675 (1958); The Glidden Co., 121 NLRB 752, 755–756 (1958); Rett Electronics, Inc., 169 NLRB 1111 (1968); and Joslyn Mfg. and Supply Co., 171 NLRB 54 ·(1968).

In *Allied*, however, the Board also observed that "especially does it believe that no participant in a Board election should be permitted to suggest either directly or indirectly to the voters that this Government Agency endorses a particular choice." 109 NLRB at 1272. Taken out of context, the statement immediately following the ballot form, "OUR ·U. S. GOVERNMENT AGREES —'UNIONS ARE GOOD,'" might seem to constitute a skating toward the thin edge of protection from *Allied* inundation. However, taking the statement out of isolation and in the climate of a union election, we agree with the Board that the statements in ·the leaflets "do not inherently suggest governmental approval of the material issued" or that the Government looked with favor upon the Union's being selected exclusive bargaining representative.

The quoted statement in the November 18th handbill about encouraging collective bargaining is an accurate paraphrase of the policy statement contained in the Act. The source of the statement is given; and the leaflet clearly indicates that the Union, not any governmental unit, is the issuer. As for the quotations attributed to former Presidents, although Clarytona hints that the statements were taken out of context, it neither substantiates this veiled charge nor directly challenges the accuracy of the quotations. *Compare* Tyler Pipe Industries, Inc. v. NLRB, 447 F.2d 1136 (5th Cir. 1971), denying enforcement to 180 NLRB 880 (1970), on remand from 406 F.2d 1272 (5th Cir. 1969). Further, to construe such general expressions of sympathy for the working man by three deceased leaders as suggestions of approval of the Union by the current Government is to distort simple, obvious campaign propaganda.

On ultimate analysis, the significant factor in determining whether there is a tendency to mislead, insofar as the present point is concerned, is the utilization of official Board documents in connection with a partisan communication, even though that message may on the whole be innocuous. Thus, in a recent case in this court, it was stated that to say the message there involved " 'could in no manner be interpreted by the employees as an endorsement by the Board of the Union' flies in the face of reason and experience." NLRB v. John S. Barnes Corp., 478 F.2d 1105 at 1107 (7th Cir., 1973). In that case, the message was considered to be in conjunction with an official Board document, and this court held the *Allied* rule to be applicable. Here, however, as we have indicated, the foundation of the use of the official Board document is lacking. Of course, we do not in dealing with the *Allied* question mean to suggest that if a party to an election attempts to mislead by asserting that the Board is in favor of its position it might not be fatal to the validity of the election even in the absence of the use of an official document. That, however, is not the situation here.

In the administrative proceedings, Clarytona contended that the portion of the November 19th handbill we quoted above was "clearly intended to advise the employees that strikes will not occur, and that it is the Board's responsibility to see that they do not." Allegedly a significant issue during the campaign

had been that strikes might occur if the Union organized the nursing home.[4] Clarytona maintains that the Union's "eleventh-hour" misstatement violated the *Hollywood Ceramics Co., Inc.* doctrine, 140 NLRB 221, 224 (1962), which provides:

> "We believe that an election should be set aside only where there has been a misrepresentation or other similar campaign trickery, *which involves a substantial departure from the truth,* at a time which prevents the other party . . . from making an effective reply, so that the misrepresentation, whether deliberate or not, *may reasonably be expected to have a significant impact on the election.* However, the mere fact that a message is inartistically or vaguely worded and subject to different interpretations will not suffice to establish such misrepresentation as would lead us to set the election aside. . . . But *even where a misrepresentation is shown to have been substantial,* the Board may still refuse to set aside the election if it finds upon consideration of all the circumstances that the statement would not be likely to have had a real impact on the election." (Footnotes omitted; emphases added.)

In our opinion the Board did not abuse its discretion in rejecting Clarytona's contention that the distribution of the November 19th flyer warranted the election's being set aside. Contrary to Clarytona's argument, the objected-to passage does not aver that "it is the Board's responsibility to see that [strikes] do not [occur]." The passage does suggest that union representation does not necessarily result in work stoppages. It also indicates that the Board

"assists" the parties in reaching agreement. Even if the figure of 90% peaceful settlements is inaccurate, the substance of the Union's message is an acceptable interpretation of the applicable law and of existing conditions. The passage might conceivably imply that the Board affirmatively intervenes in negotiations and to that extent be incorrect. But we do not believe that the implication is sufficient to warrant holding the election to be invalid under *Hollywood Ceramics.*

In sum, we do not find any of the individual items to which Clarytona objects to be so improper as to justify our overturning the Board's decision. Further, we reach the same conclusion when we consider the combined impact of all of the items, as the employer urges us to do. Communications to employees in the pre-election period seldom reach the status of being belletristic contributions, and that was so here. That they may have been persuasive to the voters—something was—is not the test but rather it is whether they were improperly so. We cannot say they were.

Under the Board's rules, post-election hearings are conducted only where "substantial and material factual issues exist which can be resolved only after a hearing." 29 C.F.R. § 102.69(c). See also 29 C.F.R. § 102.69(e). We agree with the Board that Clarytona's objections raised no substantial and material issues of fact. Therefore, no hearing was or is required. See Judge Sprecher's recent discussion of this point in Louis-Allis Co. v. NLRB, 463 F.2d 512, 519–520 (7th Cir. 1972).

Accordingly, we grant the Board's petition for enforcement of its order.

---

4. We note that Clarytona did not claim that this had been a significant issue in the campaign until it filed with the Board its exceptions to the Regional Director's report.