**REGENCY ELECTRONICS, INC.,**
**Petitioner,**

v.

**NATIONAL LABOR RELATIONS**
**BOARD, Respondent.**

**No. 72–2001.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 21, 1973.

Decided Dec. 3, 1973.

On Rehearing March 14, 1974.

James K. Sommer, Indianapolis, Ind., for petitioner.

Peter G. Nash, Gen. Counsel, William L. Corbett, Atty., National Labor Relations Board, Washington, D. C., for respondent.

Before SWYGERT, Chief Judge, HASTINGS, Senior Circuit Judge, and CHRISTENSEN, Senior District Judge.*

* Senior United States District Judge A. Sherman Christensen is sitting by designation.

HASTINGS, Senior Circuit Judge.

We have for consideration the petition of Regency Electronics, Inc. (the Company), to review and set aside an order of the National Labor Relations Board (the Board) issued against it on November 30, 1972, pursuant to § 10(c) of the National Labor Relations Act, as amended, Title 29 U.S.C. § 151 et seq. (the Act). This order is reported at 200 NLRB No. 88. The Board has cross-petitioned for enforcement of its order. We have jurisdiction since the underlying unfair labor practice is alleged to have occurred at the Company's plant in Indianapolis, Indiana. The Company is engaged in the manufacture, sale and distribution of electronic equipment and related products.

The Board found that the Company had violated §§ 8(a)(5) and (1) of the Act by refusing to bargain with the International Union of Electrical, Radio and Machine Workers, AFL-CIO (the Union), which had been certified by the Board as the exclusive bargaining representative of the employees of the Company in the representation proceedings hereinafter set out.

On October 20, 1971, the Union filed a petition for a representation election, together with a stipulation for certification upon consent election executed by the Union and the Company. Pursuant to the stipulation, the election was held on December 17, 1971, in a unit of certain employees of the Company. A total of 221 valid votes were counted. The Company received a majority, 117 to 104. In addition, there were 12 challenged votes cast which were not counted. Since the challenged ballots were insufficient in number to affect the outcome of the election, the challenges were not resolved.

On December 22, 1971, the Union filed timely objections to the election alleging in substance that on December 16, 1971, the day prior to the election, the Company had (1) coerced and intimidated an employee; and (2) distributed to all employees an exact duplicate of the Board's sample ballot, and marked an "X" and a red heart in the "NO" square, thereby giving the impression that the Board was endorsing the Company's position. The Regional Director of the Board timely and properly investigated the Union's two objections and on January 28, 1972, issued his report and recommendations to the Board. He found the allegation that the Company had coerced and intimidated an employee to be without merit. However, he found merit in the Union's objections to the Company's distribution of the marked sample ballot and recommended that the Board direct a new election.

Overruling timely filed objections by the Company to the Regional Director's report on objections, on February 25, 1972, the Board issued a decision adopting the Regional Director's findings and recommendations, setting aside the results of the election and ordering a second election. As a part of this order the Board established a new voter eligibility list including unit employees "employed during the payroll period immediately preceding the date of issuance of the Notice of Second Election." Accordingly, employees hired subsequent to the eligibility date of the first election were to be permitted to vote in the second election.

Subsequently, the second election was held March 24, 1972, which resulted in 245 valid ballots being cast. The Union received a majority, 133 to 112, with no challenged ballots. On March 31, 1972, the Company filed timely objections to the results of the second election alleging, *inter alia*, that the first election was improperly set aside and, further, that the Board improperly selected a new eligibility date for the second election.[1] Following proper administrative procedures, on August 1, 1972, the

1. Out of a total of twelve objections filed, the Company requests review of only these two objections.

Board issued a supplemental decision and certification of representation finding no merit in the Company's objections and certifying the Union as the exclusive bargaining representative of the Company's employees in the bargaining unit found appropriate.

In order to seek judicial review, the Company refused to comply with the Union's request to bargain. An unfair labor practice complaint was subsequently filed. The matter was finally transferred to the Board itself for consideration of a show cause order on the General Counsel's motion for summary judgment and the Company's response thereto.

These proceedings culminated on November 30, 1972, in the Board's ordering the Company to cease and desist from refusing to bargain with the Union. It is this order which is the final order under present consideration by our court.

I.

The core of the first issue is whether the Board was warranted in setting aside the first election on the sole ground that the Company, on the day before the first election, distributed to all employees an exact duplicate of the Board's sample ballot altered in such a manner as to tend to mislead the employees to believe that it implied an endorsement of the Company by the Board. In short, the use of this type of information under the surrounding circumstances might have had an undesirable impact on the employees' freedom of choice.

The facts are not in dispute. There was the usual propaganda by both parties preceding the first election on December 17, 1971. The Union distributed leaflets referring to "Love Letters" from the Company as an attempt to "Brain-Wash" the employees to vote against the Union. The Company responded in a light vein with a leaflet entitled "The Regency Love Story," using thereon a number of red hearts. The Union reacted with further reference to the "Love Letters." There is no complaint by either party that this preliminary propaganda skirmishing was improper.

However, on the day before the election, the Company distributed to all employees another campaign propaganda leaflet which it refers to on brief as the "Second Heart Leaflet." This was printed on one page of smooth white paper with the Company's name and symbol at the top, followed by company printed propaganda matter and an exact duplicate Board official sample ballot with an "X" marked in the "NO" box over which box was superimposed a red heart. We have attached a copy of this leaflet as an appendix to this opinion, except that here the color of the red heart is not evident.

In considering the Union's objection to the Company's use of the Board's sample ballot in the first election, the Regional Director stated:

"* * * * The ballot set forth on Exhibit A is identical in size and content with the official election ballot. The rule set forth in Allied Electric Products, Inc., 109 NLRB 1270 is therefore applicable and Exhibit A is objectionable. Contrary to the Employer the criterion is not whether the entire document is an official agency document, or contains other propaganda which clearly marks it as the product of a party, but whether the reproduced ballot itself is distinguishable from the agency's official ballots in size or content. Hughes Tool Co., 119 NLRB 739 and cases cited.

"The ballot used in the instant case clearly is not. Similarly, contrary to the Employer, the Board has not modified the Allied Electric rule. * * * [Cases cited] holding marked ballots unobjectionable all dealt with ballots clearly distinguishable in size or content from the Board's sample or official ballot. As above noted the ballot produced by the Employer is indistinguishable from the official sample bal-

lot produced on the official election notice." [2]

Accordingly, the Regional Director recommended that this single objection be sustained.

It is beyond dispute that the duplicated ballot is identical in size and content with the Board's sample official ballot. It follows that here we are concerned with the Company's use of an official Board document in its flyer or leaflet. We do not have the use of a simulated or sketchy ballot or obvious propaganda statements in isolation from the official Board document.[3]

As earlier indicated and shown in the so-called Second Heart Leaflet, the copy of the official sample ballot has an "X" marked in the "NO" box over which is superimposed a red heart. At the top of the leaflet appears the symbol and name of the Company and below that appears a statement of obvious propaganda. The Company urges that this is merely a legitimate response to Union propaganda, particularly with respect to repeated Union reference to the Company's "Love Letters" and the use of red hearts on Union leaflets. We agree with the Company that we can view this Second Heart Leaflet and construe it for ourselves and evaluate its import. .

The Company argues strenuously that the Board erred in setting aside the first election because the Board's action "was based on a mechanical application of a rule against the use of marked ballots" which the Board "purported to judicially promulgate * * * for future application as a *per se* rule in Allied Electric Products, Inc., 109 N.L.R.B. 1270 (1954)."

*Allied Electric Products* has been the subject of much judicial comment and Board treatment over the years. Our recent decision in NLRB v. John S.

Barnes Corporation, 7 Cir., 478 F.2d 1105 (1973), as well as the subsequent decision in NLRB v. Clarytona Manor, Inc., 7 Cir., 479 F.2d 976 (1973) shed dispositive light on this contention.

In *Barnes, supra,* we recognized the rule in *Allied Electric Products* but preferred the Board's subsequent rule in Rebmar, Inc., 173 NLRB 1434 (1968), where the Board set aside an election when the Board's election notice (a Board official document) had been reprinted and altered. We quote from *Barnes* the preferred rule which reads:

" 'Our concern is not with the substance of the material added to the Board's official notice of election, but with the possible impact such a partisan message added to an official Board document, or copy thereof, might have on the freedom of choice of the voter. We are of the opinion that the Board has a responsibility to inform employees fully of their rights and privileges under the Act, and to conduct elections in an atmosphere conducive to a determination of the uninhibited preference of employees. To that end the Board's notice of election contains information the Board believes should be made available to employees to improve their capability of casting a vote that fully reflects this freedom of choice. To this end the Board also publishes a leaflet including the same type of information, and it is available to anyone who desires to use it. The Board also has a responsibility to protect its processes against abuse or undesirable use. To duplicate a part of the Board's official notice and then to add to it a personal partisan message that may be interpreted by the employee as an endorsement by the Board of one of the parties to the election, and thus have an*

---

2. Footnotes omitted, except that in note 4 the Regional Director states: "The Employer's claim that the red heart superimposed on the X in the no box of the ballot distinguishes it from the official ballot is without merit since in all the circumstances the heart like the X itself constitutes a marking

of the ballot and does not constitute what otherwise is clearly an official ballot an employer ballot."

3. Such was the situation in NLRB v. Clarytona Manor, Inc., 7 Cir., 479 F.2d 976, 981 (1973).

impact on the employees' freedom of choice is, we think, an undesirable use of Board documents designed for another purpose. *That the Union's message in this case may be arguably innocuous and that there may have been at most a narrow or technical violation of the Allied Electric Products, 109 NLRB 1270, rule, is clearly irrelevant. Whether deliberate or unintentional, such action has a tendency to mislead, and we are of the opinion that the Board should guard against having its prestige put to such possible abuse.'* [*Rebmar*] at 1434 & 5 (Emphasis added.)" *Barnes, supra,* 478 F.2d at 1107–1108.

We recognized in *Clarytona Manor, Inc., supra,* 479 F.2d at 981, that "the significant factor in determining whether there is a tendency to mislead \* \* \* is the utilization of official Board documents in connection with a partisan communication, even though that message may on the whole be innocuous." The court then referred to our holding in *Barnes,* 478 F.2d at 1107, that to say the message there involved " 'could in no manner be interpreted by the employees as an endorsement by the Board of the Union' flies in the face of reason and experience." In *Barnes,* we applied the *Rebmar* rule and set aside an election which was favorable to a union. Consistency requires us to apply the same standards here adversely to the Company. The court in *Clarytona* found the *Allied* rule inapplicable under the facts of that case, since no official Board document had been used.

In light of these holdings we are bound to conclude that the use of this type of information under the surrounding circumstances might have had an undesirable impact on the employees' freedom of choice.

We have considered the several other contentions urged by the Company and find them unpersuasive. We hold that the Board did not err in setting aside the first election.

II.

The second and subsidiary issue is whether the Board properly established a new voter eligibility list to include unit employees "employed during the payroll period immediately preceding the date of issuance of the notice of Second Election." The effect of the changed eligibility date was to include newly hired employees who were unable to vote in the first election.

The Company points out that after the first election it hired 48 new employees prior to the second election. Fifteen of these were required as a result of expansion in the production unit and 33 were the result of normal turnover of employees. The Company complains that this is contrary to the Board's policy in runoff elections, where there are more than two parties and no party receives a majority. It argues that the use of a new eligibility list gives the Union an unfair advantage in opening up the opportunity for manipulation of such newly hired employees. It also urges that the new employees could not know the reason why the first election was set aside. We find these arguments unpersuasive.

■ It is well settled that "Congress has entrusted the Board with a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees." NLRB v. A. J. Tower Co., 329 U.S. 324, 330, 67 S.Ct. 324, 328, 91 L.Ed. 322 (1946); NLRB v. Wyman-Gordon Co., 394 U.S. 759, 767, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969); NLRB v. Clarytona Manor, Inc., 479 F.2d 976, 979 (1973).

■ We have considered the arguments of prejudice advanced by the Company. However, on balance, we conclude that the determination of the new eligibility date and the enfranchisement of the new employees come within the wide discretion given the Board. We find no adequate showing of abuse of discretion. We conclude that the new eligibility date best effectuates the policy

of the Board to provide all affected employees a freedom of choice.

We hold that the Board properly established a new voter eligibility list for the second election.

Accordingly, the petition of the Company for review will be denied and the cross-petition of the Board for enforcement will be granted.

Review denied. Enforcement granted.

APPENDIX

EXHIBIT A

 ELECTRONICS, INC.

THIS IS ONLY A SAMPLE BALLOT PREPARED BY THE COMPANY. WHEN YOU VOTE THE OFFICIAL BALLOT WILL BE HANDED TO YOU BY THE N. L. R. B. REPRESENTATIVE AT THE ELECTION ON FRIDAY, DECEMBER 17, 1971.

Vote NO and pay NO dues

Vote NO and have NO strikes

Vote NO and walk NO picket lines

Vote NO and have NO hate campaigns

Vote NO and have NO fighting

Vote NO and have NO troubled times

WE HOPE YOU WILL GIVE US YOUR VOTE OF CONFIDENCE SO THAT WE CAN CONTINUE TO PULL TOGETHER....NOT APART.

---

UNITED STATES OF AMERICA

National Labor Relations Board

OFFICIAL SECRET BALLOT

FOR CERTAIN EMPLOYEES OF
REGENCY ELECTRONICS, INC.

SAMPLE

Do you wish to be represented for purposes of collective bargaining by -

INTERNATIONAL UNION OF ELECTRICAL, RADIO AND MACHINE WORKERS, AFL-CIO, CLC ?

MARK AN "X" IN THE SQUARE OF YOUR CHOICE

| YES | NO |
|---|---|

DO NOT SIGN THIS BALLOT. Fold and drop in ballot box.
If you spoil this ballot return it to the Board Agent for a new one.

---

ORDER

This matter is now pending before the court upon petitioner's supplement to its petition for rehearing *in banc*, respondent's answer thereto, and petitioner's reply. As to petitioner's suggestion

for a rehearing *in banc,* it now appears that no active member of this court has requested that a vote be taken thereon.

However, in light of the decision of the Supreme Court of the United States in National Labor Relations Board v. Savair Manufacturing Co., 414 U.S. 270, 94 S.Ct. 495, 38 L.Ed.2d 495 (1973), subsequent to our decision in the instant case (Dec. 3, 1973), it is now ordered that further proceedings herein be stayed until the further order of this court pursuant to the following remand:

This case is now remanded to the respondent, National Labor Relations Board, for the purpose of conducting a hearing on petitioner's Objection 4 to the results of the second election held March 24, 1972, as alternatively requested by the Labor Board in its above mentioned answer; and thereafter the Labor Board shall certify to this court its findings and conclusions as determined therein.