**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ST. LOUIS CORDAGE MILLS, Division of American Manufacturing Company, Inc., Respondent.**

No. 19842.

United States Court of Appeals, Eighth Circuit.

April 21, 1970.

Elliott Moore, Atty., N.L.R.B., Washington, D. C., for petitioner; Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, and Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., on the brief.

Harold A. Thomas, Jr., of Fordyce, Mayne, Hartman, Renard & Stribling, St. Louis, Mo., for respondent; Nelson W. Hartman and Frank E. Vigus, St. Louis, Mo., on the brief.

Before VAN OOSTERHOUT, Chief Judge, and MATTHES and GIBSON, Circuit Judges.

MATTHES, Circuit Judge.

The Board has petitioned us to enforce its order issued on March 8, 1968, finding that respondent had violated § 8(a) (5) and (1) of the National Labor Relations Act, 29 U.S.C. § 158(a) (5) and (1), by unilaterally modifying its collective bargaining agreement with Local 695, Textile Workers Union of America. We hold that respondent did not refuse to bargain in good faith with the Textile Workers within the meaning of the Act. Consequently, we deny enforcement and remand to the Board for further proceedings.

The pertinent facts are not disputed. Local 695 of the Textile Workers had been the bargaining agent for respondent's employees since 1945. Following negotiations, a new contract was entered into between respondent and Textile Workers on December 1, 1966, to be effective through March 5, 1969.

Contained as Article XXVI of this contract was a welfare fund provision which had not appeared in any previous collective bargaining agreement between the parties. Since portions thereof are of crucial importance and constitute the focal point of the present controversy, we reproduce part of Article XXVI verbatim.

"Effective February 1, 1967, the Company will, by the 10th of each month following, contribute to the St. Louis Textile Workers Union of America, AFL–CIO Welfare Fund, one percent (1%) of the earnings paid to regular employees in the certified bargaining unit (but not including probationary employees) during the preceding four payroll periods.

Effective April 19, 1968, the payment will be increased to 2.1% of the above described payroll.

It is agreed that the Fund will meet all legal requirements and obtain approval from proper government agencies, including the Internal Revenue Department, so that all payments made by the Company into such fund will be properly deductible as an expense item of its operations.

In the event the welfare fund program as conceived does not materialize, then the monies provided and paid into the fund must be used for the benefit of the St. Louis Cordage Mills employees above designated. The Company and the Union agree to meet and negotiate the manner in which these benefits are to be distributed.

The purpose of the foregoing welfare fund is to provide dental care and eye treatment for the employees,

their spouses and children. A further purpose of the fund is to provide the opportunity to the employees to purchase drugs at cost for the use of their families. Administration of the fund is to be handled through a Board of Trustees, three of whom are to be employee representatives, and three of whom will be representatives of management. It is further mutually agreed between the parties that the above contributions are not to be changed for a period of five years from February 1, 1967."

On December 6, 1966, International Union of District 50, United Mine Workers of America, filed a representation petition with the Regional Director of the Board, seeking to become certified by election as the appropriate bargaining agent for respondent's employees. This petition was later transferred to the Board for its decision.

We move to the next important phase of this case. On February 1, 1967, Charles Sallee, the business manager of the St. Louis Joint Board of the Textile Workers, wrote the respondent, among other employers, the following letter.

"I would like to have you attend a luncheon meeting at Clayton Club, 230 Bemiston Avenue, Clayton, Missouri, Monday, February 13th, 1967 at 12:30 P. M.

The purpose of this meeting is to have all employers who are now participating in the St. Louis T.W.U.A. Welfare Program get together and, (1) determine who their trustees will be, (2) establish uniform procedures and (3) raise questions, legal and otherwise.

I am sure you will find this a very interesting gathering and one which will be of benefit to all concerned.

It will be helpful if you come prepared to present your monthly contribution to this program.

If this poses any problem or raises any question, please get in touch with me."

By return letter of February 7, respondent informed Mr. Sallee that it would make no payments to Textile Workers in view of the pendency of the representation petition filed with the Board by District 50, U.M.W.A., in Case No. 14-RC-5582.

Almost immediately thereafter—to be exact, on February 9—the Textile Workers, through its attorney, filed a formal charge against respondent with the appropriate NLRB Regional Director, alleging that respondent had engaged in unfair labor practices in violation of § 8(a) (1), (2) and (3). The stated basis for the charges was that respondent, by failing to make payments to the Article XXVI Welfare Fund, had assisted District 50 in its representation efforts "by discouraging membership in" the Textile Workers local and in "encouraging membership in and activity on behalf of District 50 * * *."

An amended charge was filed by the Textile Workers on April 21, 1967, and the Regional Director issued a complaint on May 18, alleging in conformity with the amended rather than the initial charge that respondent's willful refusal to make payments to the Welfare Fund pursuant to the collective bargaining agreement from and after February 7, 1967, constituted a failure to bargain in good faith in violation of § 8(a) (5) and (1). The issues were joined by the filing of respondent's answer to the complaint, and an evidentiary hearing was conducted by a trial examiner on July 10, 1967.

In his decision of October 31, 1967, the examiner found in agreement with the complaint that respondent violated § 8(a) (5) and (1) by the unilateral modification of the collective bargaining agreement in its refusal from and after February 7 to contribute its share to the Welfare Fund. He specifically rejected respondent's assertion that no modification of the contract occurred, since the obligation to pay was contingent upon proof—of which there was none—from the Textile Workers that the Welfare

Fund had come into existence. The examiner recommended that the Board enter a cease and desist order and specifically require respondent to bargain collectively with Local 695 of the Textile Workers upon request "by participating in, and contributing the monies required pursuant to Article XXVI" of the December 1 agreement "to the extent that Respondent has not heretofore done so."

While this case was pending before it, the Board set an election in the separate representation proceeding. In early February the employees selected District 50, U.M.W.A., to represent them, and on February 9, District 50 was certified as the appropriate bargaining agent.

Following the certification of District 50, the Board, on March 8, 1968, filed *its decision and order in this proceeding,* adopting in full the findings, conclusions and recommended order of the examiner. The relevant period of time for which respondent was held accountable by the Board's order is from February 1, 1967, to February 8, 1968.

The issue, then, is, did respondent's failure to contribute money to some repository in accordance with the terms of Article XXVI of the December 1 contract amount to a unilateral modification of the contract and hence a failure to bargain collectively in good faith? As a starting point, we recognize as settled now the doctrine that, ordinarily, an employer violates § 8(a) (5) and (1) when, absent waiver by the appropriate bargaining agent of its employees, it changes the wages or hours of any of its employees, or alters any other valuable incident of their employment, without allowing the bargaining agent an appropriate and meaningful opportunity to bargain about the change or alteration. Section 8(d) of the Act, 29 U.S.C. § 158(d), itself a delineation of the import of § 8(a) (5), makes this principle abundantly clear. We stated the rule in N.L.R.B. v. Huttig Sash & Door Co., 377 F.2d 964, 967 (8th Cir. 1967), where Judge Blackmun appropriately cited N. L.R.B. v. Katz, 369 U.S. 736, 82 S.Ct.

1107, 8 L.Ed.2d 230 (1962), and Fibreboard Paper Products Corp. v. N.L.R.B., 379 U.S. 203, 209–210, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). The principle was recognized and applied in our per curiam opinion granting enforcement in Hinson v. N.L.R.B. (8th Cir. 1970).

■ But this case does not fall within the foregoing doctrine. Here, we have a contract that has been executed. One provision of that document is the subject of controversy. In this posture, we examine the controverted provision, Article XXVI, for the purpose of determining whether it imposed an absolute obligation on respondent to contribute sums of money on February 7, 1967, and at all other times relevant to this dispute. If such an unconditional obligation was *not* present, then it appears to us that respondent did not "modify" the contract. Certainly, an essential element of this type of § 8(a) (5) and (1) violation is a valid and enforceable contractual obligation existing at the time the employer is alleged to have unilaterally changed its conditions by failure to comply with its terms.

■■ The principle is firmly established that the burden is upon the General Counsel to prove the essential elements of the charged unfair labor practices. Boyle's Famous Corned Beef Co. v. N.L.R.B., 400 F.2d 154, 165 (8th Cir. 1968); N.L.R.B. v. Howard Quarries, Inc., 362 F.2d 236, 242 (8th Cir. 1966). We would indeed be hard pressed to find that this burden was carried here. A unilateral modification by failure to perform an affirmative act must require proof that performance of that act was unconditionally required or that all conditions precedent to performance had been accomplished. The General Counsel in this case, arguing that performance was unconditionally required of respondent, was content to rest solely upon the terms of the December 1 contract to supply this essential element of proof. We find that to be insufficient.

■ We are convinced from a fair reading of Article XXVI that the respondent's obligation to pay the specified sums was conditioned upon the existence of a properly constituted Welfare Fund. Reverting to the language itself, it is at once apparent that the Welfare Fund must "meet all legal requirements and obtain approval from proper government agencies * * *." Equally clear is the necessity for the selection of a Board of Trustees who are charged with the responsibility of administering the Fund. We have searched the record in vain to find any direct evidence to prove that a Welfare Fund meeting these self-imposed requirements has ever been established, and, in particular, was established as of the date of the examiner's hearing on July 10. The evidence at that hearing consisted solely of the testimony of Mr. Sallee, the Textile Workers representative, Mr. Harold V. Pate,

manager of respondent's St. Louis operation, and certain documentary evidence not pertinent here. The *only* reference to the existence of a Welfare Fund is a rather oblique, conclusory, and contradictory one found in Mr. Sallee's testimony.[1] Hence, we are left to speculation as to this important facet of the case.

In our view, respondent was not required to pay the sums of money comprehended by Article XXVI prior to the existence of a properly constituted repository for such sums. Were it otherwise, to whom would the respondent be required to pay its contribution? To the Textile Workers union as an implied trustee or escrowee? Such a relationship on an interim basis pending establishment of the proposed Fund may well have been intended, but it was clearly not expressed in the contract and therefore cannot aid the Board's case.[2] Furthermore,

1. We extract the relevant portions of Mr. Sallee's testimony given under cross-examination by respondent's counsel.

"Q. But you, as a representative, Mr. Sallee, of one of the contracting parties of this contract, gave no notice to St. Louis Cordage Mills that all of the requirements of this proposed fund, all the legal requirements, had been met, that they all had been approved by proper government agencies, including the Internal Revenue Department. You did not give Mr. Pate, or anyone connected with the Cordage Mills, notice of that approval, did you?

A. I believe the facts will bear me out that due notice has been given the employer in the manner in which I stated.

Q. In what way?

A. That the program has satisfied and met the requirements of the law that have been spelled out in the contract between St. Louis Cordage Mills and the Textile Workers Union of America.

\* \* \* \* \*

Q. (By Mr. Hartman [counsel for respondent]) Did you give any notice directly, at any time, up to the present, to Mr. Pate or to anyone connected with the St. Louis Cordage Mills that all the legal requirements had been met?

A. I did not, personally, give notice to Mr. Pate.

Q. Did anyone else in your organization do it, to your knowledge?

A. No direct notice, in that sense, has been given directly to Mr. Pate of the St. Louis Cordage.

\* \* \* \* \*

Q. Let me ask you something in regard to this welfare fund. The benefits under this welfare fund are not presently available, isn't that correct? I am speaking about the employees of the St. Louis Cordage Mills?

A. It is a new fund. No, benefits have not commenced.

Q. It is not now available to St. Louis Cordage Company, and, as I understand it, it will be available the latter part of this year, late fall or latter part of this year, am I correct?

A. September 1967."

2. We are aided in this matter by an ambiguity apparent in the language of Article XXVI. The fourth paragraph begins, "In the event the welfare fund program as conceived does not materalize, then the monies provided and *paid into the fund* must be used * * *." (emphasis added) We are at a loss to understand how monies can be paid into a fund which has failed to materialize. The Board seems to argue that the language of the section permits a distinction between "the fund" and "the welfare fund program as conceived." We think that that interpretation stretches the clear import of the terms used. Only by the finest of inferences

such a payment directly to the union might well have violated the provisions of section 302 of the Act, 29 U.S.C. § 186.[3]

██ We do not find it of critical significance, as claimed by the Board, that the reason for declining payment first expressed by the respondent in its letter of February 7 was the pendency of the representation proceeding and the imminent challenge by District 50, U.M.W.A. We need not, and expressly do not, hold that the initiation of a representation petition immediately works to absolve an employer from continuing to perform duties thrust upon it by a valid and subsisting collective bargaining agreement with the challenged union. Indeed, the Board has held otherwise. Duralite Co., Inc., 132 NLRB No. 28 (1961). The controlling fact in this case is that, at the time of the examiner's hearing, the respondent had adopted a defense to the complaint which, though rejected there, we deem to be valid.

It seems to us that this case could have been avoided. Neither union nor management is free from conduct which precipitously caused a minor dispute to develop into a major conflagration. Without any advance warning or indication of willingness to discuss the matter, the respondent flatly stated that it would not contribute money. In return, without attempting on its own part to sit down and discuss the problem or, in the alternative, engage the machinery of arbitration, the Textile Workers filed an unfair labor practice charge. Considering that the Board must have been fully cognizant of the pending certification petition of District 50, U.M.W.A., we believe that it could have, with greater responsibility, exercised its authority in an effort to bring about a reconciliation. Instead, apparently for a hypertechnical reason; it pursued a course and reached a result which effectively deprives intended beneficiaries of the fund from receiving benefits. It is hardly open to dispute that the Welfare Fund was conceived and designed for the benefit of employees. And, it is clear that the Fund was available to respondent's employees, if at all,[4] for only a relatively short period of time. Enforcement of the Board's order now would insure that respondent's employees never reap any benefit from the sums respondent pays out, since Textile Workers no longer represents these employees.

Respondent has committed itself in its brief and at oral argument to paying the amount it would have paid into a valid Welfare Fund from February 1, 1967, to February 8, 1968, but for the events above discussed. We therefore remand this case to the Board for further consideration and the entry of an appropriate order. The Board should fashion a remedy which will require respondent to pay the amount found due from it into a fund from which respondent's employees will derive benefits.

Enforcement denied. Cause remanded.

---

could there be found support for an "interim fund" or a "quasi-fund," that is, a repository set up for receipt of monies—a bank account for example—while other prerequisites of Article XXVI are being accomplished—approval from proper governmental agencies, for example. The language compels the conclusion that the "welfare fund" either exists or it does not; it has either met all prerequisites set forth in the contract or it has not. The evidence here leads us to believe that it was not a *fait accompli*, at least at the time of the examiner's hearing.

3. Section 302 makes it unlawful for an employer to make payments of money to a la-

bor organization or any of its officers. Subsection (c), 29 U.S.C. § 186(c), sets forth exceptions, one of which reads as follows:

"(c) The provisions of this section shall not be applicable * * *

(5) with respect to money or other thing of value *paid to a trust fund established* by such representative * * *." (emphasis added)

4. We were informed by counsel for the Board at oral argument that respondent's employees were never eligible for benefits from the Fund since their employer—respondent—never made its contribution.