**HALL–BROOKE HOSPITAL, a division of Hall-Brooke Foundation, Inc., Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

Nos. 521, 716, Dockets 80–4149, 80–4197.

United States Court of Appeals,
Second Circuit.

Argued Jan. 28, 1981.

Decided March 31, 1981.

George N. Nichols, Bridgeport, Conn. (Cummings & Lockwood, Paul E. Knag, Peter E. Gillespie, Bridgeport, Conn., of counsel), for petitioner.

Howard E. Perlstein, N. L. R. B., Washington, D. C. (Mendelssohn V. McLean, Atty., William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate

Gen. Counsel, N. L. R. B., Washington, D. C., of counsel), for respondent.

Before LUMBARD, VAN GRAAFEILAND and KEARSE, Circuit Judges.

LUMBARD, Circuit Judge:

Hall-Brooke Hospital, a division of Hall-Brooke Foundation, Inc., petitions us to deny enforcement of an order of the National Labor Relations Board dated July 10, 1980, requiring Hall-Brooke to bargain with Connecticut Health Care Associates ("the Union") as the exclusive bargaining representative of an approved unit of Hall-Brooke's employees. The Board cross-petitions for enforcement of its order. We deny Hall-Brooke's petition and grant the Board's application for enforcement of its order.

I.

On January 5, 1979, the Union filed a representation petition with the Board seeking certification as the collective bargaining representative of Hall-Brooke's non-supervisory employees.[1] Pursuant to a stipulation by the parties, the Regional Director conducted an election on March 8, 1979 to determine whether the Union was the desired representative of the bargaining unit. The Union won the election by a vote of 27 to 18.

Immediately following the election, Hall-Brooke filed objections with the Board, including an objection that the Union had issued campaign literature that had created the impression that the Board endorsed the Union's position in the election. The material objected to was a three-page leaflet which the Union had mailed to the eligible voters. The first page of the leaflet was a reproduction of a portion of the Board's official election notice entitled "Rights of Employees," which described various employee rights protected by the National Labor Relations Act (NLRA) and listed various employer practices which are prohibited and may cause an election to be set aside. The notice, near the bottom, states: "The National Labor Relations Board as an agency of the United States Government does not endorse any choice in the election." The name and official seal of the Board appear at the very bottom.

The second two pages of the leaflet consisted of a series of typewritten questions and answers which were favorable to the Union's position. At the conclusion of the questions and answers were the words "March 8th-Vote Yes for CHCA!" Under that were the words "Your Committee to Elect CHCA." At the very bottom of the last page was the full name of the Union and its address.

Following an administrative investigation of Hall-Brooke's objections, the Board's Acting Regional Director issued a report that found, as to the objection relevant here, that "the document in issue did not compromise the Board's neutrality nor give the impression of Board endorsement" of the Union. The report therefore recommended that the Board overrule the objections and certify the Union. Hall-Brooke filed exceptions to the report, but the Board, after consideration by a three-member panel, adopted the Regional Director's findings and recommendations. One member of the panel dissented. The Union was therefore certified as the exclusive bargaining representative.

In October of 1979, the Union attempted to bargain with Hall-Brooke. Hall-Brooke, however, chose not to bargain with the Union in order to obtain judicial review of the certification decision.[2] The Board's general

1. The agreed upon unit consisted of:
    All full time and regular part-time mental health workers, activity workers, cooks, food service workers, dietary aides, general maintenance workers, grounds men, carpenters, painters, and housekeepers, employed by the Hospital at its facility in Connecticut, excluding guards and supervisors as defined in the Act and all other employees.

2. Certification decisions are not "final orders" under §§ 10(e) and (f) of the NLRA, 29 U.S.C. §§ 160(e), 160(f) (1976), and are therefore not judicially reviewable. *See A. F. L. v. N. L. R. B.*, 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347 (1940). Instead, to obtain judicial review, ag-

counsel thereupon issued a complaint against Hall-Brooke for violations of sections 8(a)(1) and (5) of the NLRA, 29 U.S.C. §§ 158(a)(1), 158(a)(5) (1976), for refusing to bargain with a certified representative. In its defense, Hall-Brooke raised the same objections to the Union's certification as before. The matter came before the same three Board members who had initially certified the Union. Once again, by a 2–1 margin, the Board held for the Union and ordered Hall-Brooke to bargain. Hall-Brooke then petitioned this court for review.

## II.

▮ Hall-Brooke argues that the Board erred in failing to set aside the election because the circulated leaflet tended to mislead employees into believing that the Board supported the Union's position, thereby destroying the "laboratory conditions" necessary to ensure a fair representation election. *Cf. General Shoe Corp.,* 77 NLRB 124, 127 (1948). Moreover, Hall-Brooke argues that in so doing the Board acted contrary to its own precedent. In reviewing the Board's action, we are mindful that the Board is entrusted with broad discretion in creating and enforcing standards to ensure fair representation elections. *See, e. g., NLRB v. A. J. Tower Co.,* 329 U.S. 324, 330, 67 S.Ct. 324, 327, 91 L.Ed. 322 (1946); *NLRB v. Waterman S. S. Corp.,* 309 U.S. 206, 226, 60 S.Ct. 493, 503, 84 L.Ed. 704 (1940); *see also NLRB v. Olson Bodies, Inc.,* 420 F.2d 1187, 1189 (2d Cir. 1970), *cert. denied,* 401 U.S. 954, 91 S.Ct. 966, 28 L.Ed.2d 237 (1971). Careful judicial scrutiny of the Board's action is necessary, however, in the face of accusations of failure to abide by precedent since the courts have an obligation to ensure that administrative agencies adhere to enunciated policies and procedures. *See, e. g., NLRB v. Osborn Transportation, Inc.,* 589 F.2d 1275, 1279 (5th Cir. 1979); *Memorial Hospital of Roxborough v. NLRB,* 545 F.2d 351 (3d Cir. 1976).

Specifically, Hall-Brooke argues that the decision here is flatly inconsistent with the Board's decisions in *Allied Electric Products,* 109 NLRB 1270 (1954), *Rebmar, Inc.,* 173 NLRB 1434 (1968), and *GAF Corp.,* 234 NLRB 1209 (1978). In *Allied Electric,* the Board held that it would set aside any election in which the prevailing party had distributed, as part of its campaign literature, a document purporting to be a sample official ballot which was marked with a vote in either box or which contained similar alterations. In *Rebmar,* the Board set aside an election where the union had circulated a reproduced portion of the Board's official election notice—the same portion at issue here. The circulated document in *Rebmar,* however, was altered by addition of a line at the bottom saying "The Government protects your right to organize yourself in a union." On the reverse side of the document was an explanation of the functioning of a union and of the collective bargaining process. There was no indication as to authorship of the additions to the document. The Board stated that duplication of an official document with a partisan message that might be interpreted as an endorsement by the Board would require that an election be set aside. 173 NLRB at 1434. More recently, in *GAF,* the Board held that placement of the official Board name and seal on a distributed campaign pamphlet entitled "It's the Law" setting out the legal rights of employees, although signed by the Union, created an "ambiguity" as to the Board's neutrality and required invalidation of the election.

▮ In this case, the Regional Director, whose report and recommendations were adopted by the Board, stated that in general the Board will not condone any attempts to suggest Board support for either party. Here, however, the Regional Director found that the mailing of a portion of the "Rights of Employees" could not reasonably be said to have created an impression of Board endorsement. First, the document merely

grieved employers can refuse to bargain with certified representatives, thus subjecting themselves to unfair labor practice proceedings.

*See, e. g., Lipman Motors, Inc. v. NLRB,* 451 F.2d 823, 825 n.3 (2d Cir. 1971).

set out legal duties of the Board and certain unfair labor practices. Second, it was unaltered and contained no added union propaganda. Third, the document itself stated that the Board endorsed neither party in the election. Fourth, the attached Union material was clearly identifiable as the Union's partisan campaign material. It specifically gave the source of the leaflet as "Your Committee to Elect CHCA" and set forth the full name of the Union and its address. Finally, the Board's complete "Rights of Employees" notice was posted prior to the election so employees could tell it was part of an overall government document and not an endorsement of either party. Therefore, the Regional Director concluded that the circulated materials did not compromise the Board's neutrality or give the impression of Board endorsement.

Given the ample reasons for the Regional Director's finding that the Board's neutrality was not compromised, we cannot say that the Board erred in failing to set aside the election. Moreover, we conclude that the Board's ruling was consistent with its precedents. It is true, as Hall-Brooke asserts, that *Allied Electric, Rebmar* and *GAF* suggest that the Board will not tolerate the use in campaign material of the Board's name or of Board documents in a manner which suggests Board endorsement of either side in an election. Nevertheless, in this case, as the Regional Director found, there was no reasonable suggestion of Board endorsement. This result is supported by a number of other Board decisions in which the use of Board documents in campaign materials was not regarded as grounds for setting an election aside.

In *Rett Electronics,* 169 NLRB 1111 (1968) and *Associated Lerner Shops of America, Inc.,* 207 NLRB 348 (1973), objections based upon use of a reproduced sample ballot were rejected. Despite the seeming breadth of the *Allied Electric* rule regarding reproduction of sample ballots, in these cases it was held that there was no reasonable possibility that employees were misled into believing that the Board's neu-

trality was violated. In *Rett* the reproduction was considerably reduced in size without all the language of a ballot, and it appeared as part of a pictorial pamphlet distributed by the union explaining voting procedures. In *Lerner Shops,* although an arrow had been drawn under the reproduced ballot pointing to the "NO" box with the message that a no vote was a vote against the union, the Board found that the document was clearly part of the employer's campaign propaganda and therefore did not suggest Board endorsement.

Even more relevant is the decision in *A. Brandt & Co.,* 199 NLRB 459 (1972), *order to bargain,* 204 NLRB 636 (1973), *enforced,* 496 F.2d 876 (5th Cir. 1974), in which the Board refused to set aside an election where the union had distributed a reproduction of a Regional Director's decision involving the employer on which were added numerous anti-employer notations as well as a concluding plea for a vote for the union. The Board stated that the added comments could not reasonably be construed as part of the official decision, but instead were readily identifiable as partisan commentary. 199 NLRB at 459. Finally, in two very recent cases. *Alyeska Pipeline Service Co.,* 236 NLRB 1082 (1978) and *Monier Roof Tiles,* 249 NLRB No. 92 (1980), the Board has refused to set aside elections in circumstances quite similar to those in this case. In *Alyeska* the Board's "Rights of Employees" document was attached to a four-page campaign pamphlet which was distributed by the union at a pro-union meeting. In *Monier* the "Rights of Employees" document itself contained added pro-union comments, but they were clearly attributed to the union.

Despite this wealth of support for the Board's action,[3] Hall-Brooke argues that the full Board in *GAF* had adopted an extremely broad reading of *Allied Electric* and *Rebmar* to be followed in subsequent cases. Moreover, Hall-Brooke notes that members Penello and Jenkins dissented in *GAF,* yet they have formed the majority in the three member panels in this case, *Alyes-*

---

**3.** The Regional Director's report in this case, adopted by the Board, placed specific reliance upon *Brandt* and cited many of the other decisions discussed here.

*ka* and *Monier*, in all of which Chairman Fanning dissented. Hall-Brooke also points to *Monmouth Medical Center*, 234 NLRB 328 (1978), *order to bargain*, 236 NLRB 960 (1978), *enforcement denied*, 604 F.2d 820 (3d Cir. 1979), in which both members Jenkins and Penello participated. In *Monmouth* the employer had objected to a number of different campaign materials. One was a Board pamphlet which contained added pro-union comments. The Board found that the comments did not suggest Board endorsement as they were separated and readily identifiable as union propaganda. The Third Circuit, although reversing on the basis of campaign material other than the altered pamphlet, noted that it had difficulty reconciling the decision on that issue with the thrust of the decision in *GAF*. 604 F.2d at 826–27. The court also pointed out the presence of the *GAF* dissenters on the *Monmouth* panel.[4]

We disagree both with the proposition that *GAF* represented a significant broadening of restrictions against the use of Board documents in campaign materials and with the suggestion that members Penello and Jenkins have failed to abide by *GAF*'s strictures. Although Chairman Fanning, by his numerous dissents, appears to oppose any use of Board documents in campaign literature, nothing in *GAF* suggests that the Board was departing from its previous approach of attempting to determine, in each case, whether the use of Board documents would reasonably suggest the Board's endorsement of a particular party in an election. *GAF* states that an "ambiguity" regarding the Board's position created by use of Board materials is enough to set an election aside, yet that does not require that elections be set aside where comments added to Board documents are clearly separated and attributed to one of the parties.[5] Moreover, we see no merit to the suggestion that two NLRB members are refusing to adopt the position of the full Board.[6] Such a suggestion should not be made or accepted lightly, and we see no reason for overcoming the strong presumption against it. We also note that proposed decisions of three-member panels are circulated to the entire Board, and any non-participating Board member may request that a case receive full Board consideration if the member disagrees with the proposed result.[7]

For the foregoing reasons, the Board's order is hereby enforced.

---

4. The court did not note, however, that member Murphy, who dissented in *Monmouth*, did so on the basis of the other campaign material, so that all three Board members agreed as to overruling the objection to the altered Board pamphlet.

5. The majority in *GAF* plainly stated that its continued concern was with the possible impact on voters of campaign materials using the Board's name, 234 NLRB at 1210, and that, given the facts of the case, the use of the Board's name tended to mislead employees into believing the Board supported the Union's position. *Id.* at 1210 & n.1. The majority explicitly gave *its* support to the employer's position that the leaflet there in question, "so structured" with the Board's name, gave the appearance of Board support for the Union. *Id.* at 1209. We therefore do not read *GAF* as establishing a new *per se* approach invalidating any election *where campaign material included any reproduction of the Board's name or of a Board document.

6. Section 3(b) of the NLRA authorizes the Board "to delegate to any group of three or more members any or all of the powers which it may itself exercise." *29 U.S.C.* § 153(b) (1976). Congress added this provision to the NLRA to enable the Board to handle an increasing caseload more efficiently. *See* S.Rep. No.105, 80th Cong., 1st Sess. 8 *reprinted in* I NLRB, Legislative History of the Labor Management *Relations Act* 407, 414 (1947); II NLRB, Legislative History of the Labor Management Relations Act 983, 1011 (1947) (remarks of Senators Morse and Taft).

7. We also reject Hall-Brooke's argument that the decision be set aside for failing to articulate the reasoning supporting the Board's divergence from prior holdings. As noted above, we find the Board's decision consistent with Board precedent, and the Regional Director's report, adopted by the Board, clearly explained the basis for his recommendations while making reference to prior Board decisions.