**BAUER WELDING AND METAL FABRICATORS, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 81–1628.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 12, 1982.

Decided April 28, 1982.

Howard E. Perlstein, James D. Donathen, Attys., William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D. C., for respondent.

Felhaber, Larson, Fenlon & Vogt, P.A., James M. Dawson, St. Paul, Minn., for petitioner.

Before HENLEY and McMILLIAN, Circuit Judges, and NANGLE,* District Judge.

HENLEY, Circuit Judge.

This matter comes before us on a petition for review and a cross-application for enforcement of an order of the National Labor Relations Board. The Board found that petitioner (Bauer) had engaged in unfair labor practices within the meaning of Sections 8(a)(1) and (5) of the National Labor Relations Act, as amended, 29 U.S.C. § 151 *et seq.* (the Act), by refusing to bargain collectively with District Lodge No. 77, International Association of Machinists and Aerospace Workers, AFL–CIO (the Union), and, among other things, ordered Bauer to cease and desist from refusing to bargain with the Union. For reasons to be stated, we deny enforcement of the Board's order, and remand this case to the Board for an evidentiary hearing.

On January 16, 1980 the Union filed a petition for an election for all production and maintenance employees of Bauer. An election was subsequently conducted on March 20, 1980 in accordance with the terms of a Stipulation for Certification Upon Consent Election executed by the parties. The Union received a majority of the votes cast.

During the two month interval between the Union's filing of the petition and the time of the election, both parties engaged in a vigorous campaign. Bauer asserts that at various times during the campaign Union agents and supporters engaged in acts of intimidation of bargaining unit employees and others in a manner calculated to influence the employees' votes in the election. In addition, Bauer alleges that campaign materials disseminated by the Union at various times during the campaign contained material misstatements of the law on significant campaign issues, and, further, fostered the impression that the federal government and the Board supported the Union's activities in attempting to organize the employees. Finally, Bauer asserts that the election was affected by other improprieties such as the failure of the Board agent conducting the election to allow Bauer's election observers to check the seal on the ballot box, and the wearing of campaign buttons by the Union's observers and runners.

Following the certification election, Bauer filed timely objections and supplied

* The Honorable John F. Nangle, United States District Judge, Eastern District of Missouri.

documentation concerning incidents occurring during the course of the campaign. Bauer's request for an evidentiary hearing was refused. Instead, a Regional Director of the Board conducted an *ex parte* administrative investigation of the objections, and recommended in a report dated May 27, 1980 that the objections be overruled. This recommendation was ultimately adopted by the Board. The Union was certified, and Bauer refused to furnish information to the Union or to bargain.

On December 26, 1980, pursuant to a charge filed by the Union, the Board's General Counsel issued a complaint alleging that Bauer had violated Section 8(a)(5) and (1) of the Act by refusing to bargain with the Union and by refusing to furnish the Union with the information requested. On January 23, 1981 the General Counsel filed a motion for summary judgment. The Board found that all contentions raised by Bauer in the unfair labor practice proceeding regarding the Union's certification had been presented in the underlying representation proceeding and granted the motion for summary judgment. These petitions followed.

Section 10(a) of the Act confers upon this court the power "to make and enter a decree enforcing, modifying, and enforcing as modified, or setting aside in whole or in part the order of the Board." In this proceeding, the employer may contest the certification of the union and, in some circumstances, this court is empowered to order that additional evidence be taken. *See NLRB v. Winburn Tile Mfg. Co.*, 663 F.2d 44 (8th Cir. 1981); *NLRB v. Skelly Oil Co.*, 473 F.2d 1079 (8th Cir. 1973).

■ Although the underlying factual disputes differ, the procedural circumstances surrounding these petitions are indistinguishable from those present in *Winburn Tile*. In that case, we held that a party can show that summary judgment was improperly granted and that it was entitled to a hearing if

> "the requesting party [raises] substantial or material issues which, if proved, would warrant setting aside the election."

*Beaird-Poulan Division, Emerson Elec. Co. v. NLRB*, 571 F.2d 432, 434 (8th Cir. 1978). The test for determining whether material factual issues exist has been set forth in *NLRB v. Griffith Oldsmobile, Inc.*, 455 F.2d 867 (8th Cir. 1972).

> It is incumbent upon the party seeking a hearing to clearly demonstrate that factual issues exist which can only be resolved by an evidentiary hearing.... Mere disagreement with the Regional Director's reasoning and conclusions do[es] not raise 'substantial and material factual issues.' ...

455 F.2d at 868–69, *quoting NLRB v. Tennessee Packers, Inc., Frosty Morn Division*, 379 F.2d 172, 178 (6th Cir.), *cert. denied*, 389 U.S. 958, 88 S.Ct. 338, 19 L.Ed.2d 364 (1967).

663 F.2d at 46.

In addition, where the employer has specifically controverted the subsidiary factual determinations made by the Regional Director, and has offered proof which, if true, would raise material factual issues, this court has held that "the company must be afforded the opportunity to produce evidence" at a hearing wherein the testimony of witnesses may be subject to the "cleansing rigors of cross-examination." *NLRB v. Winburn Tile Mfg. Co.*, 663 F.2d at 47. *See Beaird-Poulan Division, Emerson Electric Co. v. NLRB*, 571 F.2d 432, 434 (8th Cir. 1978); *NLRB v. Commercial Letter, Inc.*, 455 F.2d 109, 113–14 (8th Cir. 1972).

The first set of issues raised concerns several alleged incidents of coercive behavior on the part of Union representatives or supporters. In one of these incidents, several letters with identical texts were sent by the local Union representative to supervisory personnel on or about February 11, 1980. These letters were on stationery bearing the letterhead of the Union, and stated, in effect, that persons could be fined up to $5,000.00 or punished by imprisonment of up to one year for committing "acts of improbity" in violation of the Act. The letters further advised these supervisors that the Union would pursue enforce-

ment of the Act should any unfair labor practices be committed.[1]

The Regional Director, in his Report and Recommendation stated:

It appears that the [Union] mistakenly referred to the criminal sanctions in Section 12 of the Act which are not applicable to unfair labor practices but to willful interference with an agent of the Board in the performance of his duties. Board remedies are remedial in nature, not punitive, and therefore Petitioner's statement is a misstatement of the law. Nevertheless, I do not believe the letter could have reasonably had an impact on the election. There is no evidence that knowledge that the supervisors had received the letters or of the contents of the letters was widespread among the employees. Furthermore, when the entire content of the letters is read in context it is questionable whether it can reasonably be considered threatening or intimidating. In any event, if it is threatening or intimidating, it is not so threatening or intimidating as to rise to the level that it can reasonably be said to have created such an atmosphere as to have interfered with the employees' freedom of choice in the election.

(Footnote omitted.)

We observe, however, that Mr. Schauls, one of the supervisors, stated in an affidavit dated April 22, 1980 that before he received the letter he was informed by an employee that the letter would be forthcoming. According to the affidavit, when Schauls asked about the contents of the letter the employee declined to divulge the contents of the letter, stating, in effect, that he did not want to be misquoted. The affidavit also recites that after Schauls had received the letter, two or three other employees asked him whether he had received it.

These recitations give rise, at a minimum, to an inference that knowledge of the contents of the letter was widespread among the plant employees. Furthermore, although it is possible that such an inference could be rebutted, we nevertheless think that this is "precisely the [type] of material [issue] warranting a hearing." *NLRB v. Winburn Tile Mfg. Co.,* 663 F.2d at 46.

Similarly, the Regional Director's broad conclusion that the letter could not reasonably be considered so coercive as to create

1. The text of these letters is as follows:

As you are aware, the INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL-CIO, has been for some time conducting an organizing campaign among the production and maintenance employees of Bauer Welding and Metal Fabricators, Inc. The *IAM* recognizes that your managerial position does *not* make you a labor relations expert and that you are being compelled to commit acts of impropriety.

In the event that your employer or your employer's representative has not already done so, the *IAM* takes this opportunity to advise you that persons committing certain violations of the Labor Management Relations Act can be punished by a fine of not more than $5,000.00 or by imprisonment for not more than one year, or both. Your employer or your employer's representative insists that you commit the acts of impropriety for obvious reasons.

Based on the aforementioned, the *IAM* suggests that you review the Labor-Management Relations Act. Under Sections 7 and 8: Section 7—Employees have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.

Section 8(a)—It shall be an unfair labor practice for an employer:

8(a–1) To interfere with, restrain, or coerce employees in the exercise of the right guaranteed in Section 7;

8(a–3) By discrimination, in regards to hiring or firing to encourage or discourage or interfere with membership in any labor organization.

Please be advised that the *IAM* will abide by the Labor-Management Relations Act throughout this organizing campaign and it is expected that the company do the same. Further be advised that the *IAM* will pursue enforcement of the Labor-Management Relations Act should any unfair labor practices be committed.

We sincerely hope that this campaign can be conducted on a level contemplated by the intent of the Act.

an atmosphere interfering with the employees' freedom of choice is not supported by any subsidiary findings of fact, and also may reflect a misapprehension of the applicable law in this area in that each incident of coercion alleged by Bauer was treated separately by the Director.

Assuming for the purposes of this discussion that the letter was threatening or intimidating,[2] we observe that in some cases a single incident of misconduct may be deemed sufficiently coercive that it has a probable effect on an employee's actions at the polls. *See NLRB v. Payless Cashway Lumber Store of South St. Paul, Inc.*, 508 F.2d 24, 28 (8th Cir. 1974). Furthermore, even where an incident of misconduct, not insubstantial in nature,[3] is insufficient by itself to show that an election was not an expression of free choice, two or more such incidents, when considered together in the totality of the circumstances, may be deemed sufficient to support such a conclusion. *NLRB v. Van Gorp Corp.*, 615 F.2d 759, 764–65 (8th Cir. 1980).

Had the mailing of these letters been the only incident of impermissible coercion alleged, we think the issue would be close. We need not, however, decide whether this incident alone is sufficient to justify a hearing because other incidents of coercion have been alleged.

One of these incidents involved employee Philippi who stated in an affidavit dated April 27 or 29, 1980 that he had attended a Union meeting on January 23, 1980 in response to an invitation handed him by employee McLellan earlier that month.

The affidavit contained the following statements:

At the conclusion of the meeting, Gary Daiker [another employee] asked me to sign a Union authorization card. Gary yelled out my name and said something to the effect, Hey Dennis are you going to sign a Union card now? I detected a lot of anger in Gary Daiker's voice so I decided to say, Yes, and sign a Union card. . . .

After the meeting was adjourned, I . . . left the Union hall. When I reached . . . the parking lot, I was stopped by [employees] Rick McLellan, Gary Daiker, Mark Robbins, and Peter Madison. They all said something to the effect that I'd better have meant what that Union card represented when I signed it. Gary Daiker then said something to the effect that I'd better have meant it by signing the Union authorization card, while poking his finger into my chest. I was not physically held by any of these four but they had me circled.

The Regional Director dismissed this incident because there was no evidence that the employees involved were agents of the Union or otherwise authorized to speak for the Union, and because there was no evidence that the Union had any knowledge of this incident. The conduct of non-member Union supporters has, however, previously been considered to be a factor in decisions of this court which have denied Board petitions for enforcement of its orders.

For example, in *NLRB v. Van Gorp Corp.*, supra, an employee named Davis, who was "apparently a Union supporter," stated to another employee that " 'there [were] likely to be some broken windows' " in his car if some employees did not support the Union. 615 F.2d at 763. This court noted that "Van Gorp does not include among those alleged to be Union agents Terry Davis, who was the active participant in two of the four incidents. Therefore, at most, the conduct at issue was only partly attributable to the Union." *Id.* at 765. This court went on to state, however, that "this kind of threat of physical violence might be most serious when made by a third party not subject to regulation by the Board," and ultimately concluded that "[w]e cannot close our eyes to the cumula-

---

2. The Regional Director did not make any findings on this issue, and indeed termed the issue "questionable."

3. An incident of misconduct that is not insubstantial is one that is serious enough to raise doubts whether an election was an expression of employee free choice. *NLRB v. Van Gorp Corp.*, 615 F.2d 759, 765 (8th Cir. 1980).

tive effect of the serious last minute misrepresentation by the Union and the coercive conduct of Union supporters." *Id. See also NLRB v. Payless Cashway Lumber Store of South St. Paul, Inc., supra.*

Because the two above-described incidents raise material factual issues, and because sufficient offers of proof were made, we conclude that an evidentiary hearing on both issues is warranted. We deem it unnecessary to discuss in detail the other alleged incidents of coercion. It is sufficient to note that evidence of the remaining incidents, if credible, may at the very least be material to the issue whether, in the totality of the circumstances, a free and fair election was held. *See NLRB v. Van Gorp Corp.*, 615 F.2d at 765. Accordingly, a hearing on the other alleged incidents of coercion is merited as well.

It remains to be determined whether summary judgment was appropriate on the remaining issues raised in the petitions. The first of these issues involves a two-page handout distributed by the Union to plant employees.

The first page of the handout warns employees that employers typically resort to threats to discourage unionization, and that such threats normally include plant closures. The Union then stated on the first page:

On the next page you will find a reproduction of a letter signed by a Chairman of the NATIONAL LABOR RELATIONS BOARD. Please note (in the second paragraph) that an employer *cannot* close down the plant because the Union has established its majority status and bargaining rights.

Further, please note that an employer *cannot* reduce wages or take away benefits such as insurance and pensions. DON'T BE FOOLED BY COMPANY RUMORS!!! (Emphasis in original.)

The letter to which the Union referred was written by former Board Chairman McCullough on July 22, 1964 in response to an inquiry from a member of the House of Representatives. The letter is reproduced in its entirety on the second page of the Union handout, the second paragraph of which states:

As a general proposition, an employer cannot reduce wages or take away any insurance or other benefits, or close down the plant because the union has established its majority status and bargaining rights. Neither can he threaten to do so if the union wins an election. Such conduct would be in direct contravention of the underlying principles of the National Labor Relations Act, which our Board enforces. (Emphasis deleted.)

■ Bauer maintains that the handout contains several material misstatements of the law which would justify the setting aside of the election. The Regional Director, however, reached the opposite conclusion. A misrepresentation of fact or law made by either an employer or a union will justify the setting aside of a representation election if it involves a substantial departure from the truth, made at a time which prevents the other party from making an effective reply, so that the misrepresentation may reasonably be expected to have a significant impact on an election. *NLRB v. Target Stores, Inc.*, 547 F.2d 421, 424 (8th Cir. 1977); *NLRB v. Modine Manufacturing Co.*, 500 F.2d 914, 915 (8th Cir. 1974).

In this context, Bauer first contends that McCullough's letter was rendered obsolete by the Supreme Court's decision in *Textile Workers Union of America v. Darlington Manufacturing Co.*, 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965). *Darlington* stands for the proposition that an employer may close or liquidate his entire business even where such closing is motivated by anti-union sentiment. *Darlington*, however, may have been limited in subsequent decisions. For example, where an employer, being motivated by anti-union animus, closes part of its business in order to gain an unfair advantage, *see First National Maintenance Corp. v. NLRB*, 452 U.S. 666, 101 S.Ct. 2573, 2582, 69 L.Ed.2d 318 (1981), or subcontracts part of an integrated business, and such action is motivated at least in part by anti-union animus, *see NLRB v. Townhouse T.V. & Appliances, Inc.*, 531

F.2d 826 (7th Cir. 1976), or relocates its business because of anti-union animus, *see NLRB v. Triumph Curing Center*, 571 F.2d 462 (9th Cir. 1978); *International Ladies' Garment Workers Union, AFL–CIO v. NLRB*, 463 F.2d 907 (D.C.Cir.1972), such practices have been held to be unfair labor practices.

We observe, moreover, that while an employer's closing of his entire operation may be permissible under *Darlington*, an employer's *threatening* to close his plant if employees select union representation has consistently been held to be a violation of the Act. *NLRB v. Gissel Packing Co., Inc.*, 395 U.S. 575, 618–19, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (1979); *NLRB v. Broyhill Co.*, 514 F.2d 655, 657 (8th Cir. 1975).

We find that the statements relating to plant closings in the handout could conceivably rise to the status of material misstatements of the law only if the circumstances in the instant case are so nearly identical to those present in *Darlington* that the cases could not, for all practical purposes, be distinguished. Because Bauer has not alleged such circumstances here, we hold that it has not made an offer of proof sufficient to raise a material factual issue warranting a hearing on the plant closing statements. *See NLRB v. Target Stores, Inc.*, 547 F.2d at 425.

The statements relating to wage reductions are more troublesome. These statements include a statement on the first page of the handout that "an employer *cannot* reduce wages or take away benefits such as insurance and pensions," as well as a statement in Chairman McCullough's letter that "[a]s a general proposition, an employer cannot reduce wages or take away benefits . . . because the union has established its majority status."

We agree with the Regional Director that the statement contained in Chairman McCullough's letter is not a misstatement

of the current law, because it is clear that an employer violates the Act by reducing wages or benefits in retaliation against a union drive, *see Chemvet Laboratories, Inc. v. NLRB*, 497 F.2d 445, 449–50 (8th Cir. 1974), or by unilaterally changing wages or benefits without consulting or bargaining with a certified union. *NLRB v. St. Louis Cordage Mills*, 424 F.2d 976, 979 (8th Cir. 1970). The Act, however, does not prohibit reductions of wages or benefits where such reductions are the result of good faith bargaining between an employer and a union. *See South Shore Hospital v. NLRB*, 630 F.2d 40, 44 (1st Cir. 1980), *cert. denied*, 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981); *Neon Sign Corp. v. NLRB*, 602 F.2d 1203, 1204–05 (5th Cir. 1979); *NLRB v. Amoco Chemicals Corp.*, 529 F.2d 427, 432–33 (5th Cir. 1976); *NLRB v. Dent*, 534 F.2d 844, 847 (9th Cir. 1976). Consequently, the unqualified statement that an employer cannot reduce wages or benefits, appearing on the first page of the Union handout, is *not* an accurate statement of the law.

We note that the Regional Director did not make any specific finding as to the materiality of this misstatement, and, similarly, we do not presume to make such a finding on the basis of the record now before us. It is possible, however, that the misstatement, when read in connection with other Union handouts, might tend to mislead some employees in their assessment of the benefits to be gained as a result of Union representation.[4] *See Monmouth Medical Center v. NLRB*, 604 F.2d 820, 827–28 (3rd Cir. 1979).

The Regional Director also held that in any event the employer could not prevail on this issue because it had effectively rebutted the statements in its February 14, 1980 handout. It is questionable, however, whether Bauer could ever effectively or credibly rebut a misstatement buttressed by a document such as Chairman McCullough's

---

**4.** We note, for example, that an unqualified statement that an employer cannot reduce benefits, when combined with other statements to the effect that a vote for the Union is a vote for increased wages or benefits, *see, e.g.*, Appendix of Petitioner at A–82, could lead an employee to conclude that he had nothing to lose by voting for Union representation.

letter. *See Thiokol Chemical Corp.*, 202 N.L.R.B. No. 57, 82 L.R.R.M. 1583 (1973). Accordingly, because we think the issue is relatively close, and because we have previously determined that a hearing on the coercion issues is merited, we deem it appropriate to require a hearing on this issue as well.

The next issue raised by Bauer relates to other campaign materials distributed by the Union. Bauer contends that these materials, some of which contained caricatures of "Uncle Sam" along with statements such as "Uncle Sam says IT'S OK TO ORGANIZE," and "I protect your right to join the [Union]" acted to compromise the neutrality of the United States and the Board. We observe, however, that the Board's letterhead does not appear on any of these other documents, and that the Union's insignia is prominently displayed on the first page of each document. Similarly, the reproduction of Chairman McCullough's letter in the arguably misleading Union handout was an unaltered reproduction of the *entire* letter, including the date of the letter (July 22, 1964) and a salutation to Congressman Patman. There is nothing in the letter which would support an inference that the Board supported the Union.

We feel that the Regional Director could properly conclude, based on the evidence before him, that none of these documents compromised the neutrality of the Board or of the United States.[5] No material issues meriting a hearing have been raised in this area, and, therefore, no hearing will be required on such issues. *See Hall-Brooke Hospital v. NLRB*, 645 F.2d 158, 160–61 (2nd Cir. 1981); *NLRB v. Clarytona Manor, Inc.*, 479 F.2d 976, 980–81 (7th Cir. 1973); *Huntsville Manufacturing Co.*, 240 N.L.R.B. No. 172, 100 L.R.R.M. 1435, 1435–38 (1979); *Associated Lerner Shops of America, Inc.*, 207 N.L.R.B. No. 18, 84 L.R.R.M. 1463 (1963).

With regard to the remaining issues raised in the briefs we find that the Regional Director's conclusions on these issues are supported by substantial evidence in the record, and that no material factual issues have been raised which would warrant resolution through the use of an evidentiary hearing. Accordingly, we deny enforcement of the Board's order and we remand for an evidentiary hearing on the coercion and misstatement issues only.

McMILLIAN, Circuit Judge, dissenting in part.

I dissent in part. In my view the employer's objections about whether knowledge of the alleged threats was widespread among the unit employees and whether the union supporters were in fact union agents were speculative and unsupported by the required specific offers of proof. I do not agree that the employer demonstrated that substantial and material factual issues exist which can only be resolved by an evidentiary hearing; rather, I think that the employer has merely challenged the interpretation of and the inferences drawn from the factual findings made by the Regional Director. *See, e.g., NLRB v. Target Stores, Inc.*, 547 F.2d 421, 425 (8th Cir. 1977); *NLRB v. Griffith Oldsmobile, Inc.*, 455 F.2d 867, 868–69 (8th Cir. 1972).

I would enforce the order of the Board in full.

---

5. With regard to the Union's handout containing Chairman McCullough's letter, our holding that the use of the letter did not, on its face, compromise the Board's neutrality is not inconsistent with our previous holding that the use of such a letter to buttress a material misstatement of the law may preclude effective rebuttal of the misstatement.