**BAUER WELDING AND METAL FABRICATORS, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 84–1454.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 10, 1984.

Decided March 27, 1985.

James M. Dawson, St. Paul, Minn., for petitioner.

William Bernstein, Washington, D.C., for respondent.

Before ARNOLD, FAGG, and BOWMAN, Circuit Judges.

BOWMAN, Circuit Judge.

Petitioner Bauer Welding and Metal Fabricators, Inc. (the Company) asks this Court to set aside an order of the National Labor Relations Board (the Board) directing it to bargain with the International Association of Machinists, District Lodge No. 77 (the Union). The Company refuses to bargain because it believes that during the course of the campaign preceding the representation election the Union and its supporters committed acts which vitiated the employees' right to exercise free choice in the election. Finding adequate support in the record for the Board's order, we deny the Company's request for relief.

## I. Background

On January 16, 1980, the Union petitioned on behalf of the Company's production and maintenance employees for a representation election to determine if they desired to designate the Union as their collective bargaining agent. The petition was granted, and after a campaign lasting about two months, an election was held, the Union winning by a vote of 32 to 20.

Following the election, the Company filed objections to the election with the Board. The Company alleged that misrepresentations contained in Union literature and acts of intimidation against employees by the Union and its representatives vitiated the free choice of the employees. The Regional Director of the NLRB filed a report recommending that the objections be overruled. The Regional Director's report was adopted by a three-member panel of the Board which found "no material or substantial issues of fact or law" that warranted setting aside the election.

The Company continued to assert its objections to the election by refusing to bargain with the Union. After exhausting its administrative remedies, the Company petitioned this Court for review of the Board's order. This Court, in *Bauer Welding and Metal Fabricators, Inc. v. NLRB*, 676 F.2d 314 (8th Cir.1982) (*Bauer I*) determined that the Company had presented enough evidence so that a hearing on two of its objections—pertaining to a misrepresentation and to the existence of a coercive atmosphere—was required. The Court therefore denied enforcement of the Board's order and remanded the case to the Board for an evidentiary hearing on those objections. Pursuant to that remand, a hearing was conducted before an administrative law judge (ALJ), who found the evidence of misrepresentation and coercion insufficient to warrant overturning the election. The Board adopted the findings of the ALJ and ordered the Company to bargain with the Union. The Company now petitions this Court, charging that the Board has abused its discretion in overruling the Company's objections to the election.

## II. Standard of Review

 Our scope of review in a petition to enforce or deny enforcement of an order of the Board is very narrow. The Board has broad discretion in carrying out its functions and its findings and conclusions must be upheld "so long as they have warrant in the record and a reasonable basis in law." *Nabisco, Inc. v. NLRB*, 738 F.2d 955, 957 (8th Cir.1984). The party objecting to the election has the burden of proof and must show not only that misconduct occurred "but that [the misconduct] interfered with the employees' exercise of free choice to such an extent that [it] materially affected the results of the election." *NLRB v. Golden Age Beverage Co.*, 415 F.2d 26, 30 (5th Cir.1969), *accord NLRB v. Griffith Oldsmobile, Inc.*, 455 F.2d 867, 871 (8th Cir.1972). With these principles in

mind, we turn to the Board's disposition of the Company's objections.

## III. The Misrepresentation Claim

One of the first pieces of Union literature distributed during the campaign was the so-called "Bombs Away" flyer.[1] In *Bauer I* we found the brochure's statement that "an employer cannot reduce wages or take away benefits such as insurance and pensions" to be a misstatement of law. 676 F.2d at 320. Wages and benefits may be reduced through the collective bargaining process. *Id.* On the reverse side of the brochure, a letter from former Board Chairman McCullough correctly states that wages or benefits may not be reduced in *retaliation* for seeking to select a collective bargaining agent. This letter does not address the misstatement made in the brochure, but it is obvious that an unwary reader could readily conclude that the letter supports the misstatement.

■ In essence, the Company argues that inclusion of an inaccurate statement of law in a brochure which uses a Board document in apparent support of the statement constitutes a *per se* ground for setting aside an election. In making this argument the Company relies upon *Thiokol Chemical Corp.*, 202 N.L.R.B. 434, 434–35 (1973). We do not read that decision, however, as supporting the *per se* rule the Company would have us adopt. In *Thiokol*, the employer used portions of an outdated Board publication to misrepresent the reinstatement rights of economic strikers. The Board held that such misuse of outdated Board material, in a manner that implied Board sanction of a misstatement of law, constituted grounds for setting the election aside. The Board's two chief concerns were preservation of its neutrality in representation elections and preventing the use of obsolete Board publications containing misstatements of the law. *Id.* The Board felt that the presence of these factors would render futile any attempt to rebut such a misstatement.

This Court held in *Bauer I* that, unlike the brochure in *Thiokol*, the "Bombs Away" flyer did not compromise the neutrality of the Board. *Bauer I*, 676 F.2d at 321. Moreover, as found by the ALJ, the letter of Chairman McCullough used in the "Bombs Away" flyer contained an accurate, if not comprehensive, statement of the law and was reproduced in its entirety rather than in part as was the publication in *Thiokol*. Thus *Thiokol*, although highly instructive, is clearly distinguishable from the instant case.

On remand, the ALJ applied the principles of *Hollywood Ceramics*, 140 N.L.R.B. 221 (1962),[2] in assessing the impact of the misstatement. These principles, as applied by this Circuit in *NLRB v. Modine Manufacturing Co.*, 500 F.2d 914, 915 (8th Cir. 1974), were restated in *Bauer I* as follows:

A misrepresentation of fact or law made by either an employer or a union will justify the setting aside of a representation election if it involves a substantial departure from the truth, made at a time which prevents the other party from making an effective reply, so that the misrepresentation may reasonably be expected to have a significant impact on an election. 676 F.2d at 319.

■ In applying this test, the ALJ was bound by our determination in *Bauer I* that the statement regarding wages, pensions, and benefits was a misstatement of the law and that it may have materially affected the outcome of the election. However, in considering the question of the materiality of the misstatement, the ALJ found that the circumstances and timing of its use mitigated its impact on the election. The "Bombs Away" flyer was distributed at the

1. This flyer was reproduced in pertinent part in *Bauer I*, 676 F.2d at 319.

2. The Board abandoned the *Hollywood Ceramics* standard for evaluating misrepresentations of fact or law in the context of representation elections in *Midland National Life Insurance Co.*, 263 N.L.R.B. No. 24 (1982). The present case, however, was initially considered by us under the principles enunciated in *Hollywood Ceramics*, and we agree that those principles provide the proper standard for this case.

beginning of the organizational campaign and focused on retaliatory actions against employees engaging in protected organizational activities rather than on the intricacies of the collective bargaining process. Subsequent Union campaign brochures, to be sure, promise that better wages, benefits, and working conditions will result from picking the Union as the employees' collective bargaining agent, but such promises are within the limits of permissible campaign propaganda. *See NLRB v. Golden Age Beverage Company*, 415 F.2d 26, 30 (5th Cir.1969). Material distributed by the Union also speaks of the negotiating process and asks that employees be "fair and realistic" when proposing wage and benefit increases to be obtained through collective bargaining. Exhibit 8 at p. 2. Moreover, the Company distributed campaign literature of its own discussing the uncertainties of collective bargaining and the possibility of reductions in wages following good faith bargaining. The ALJ found, and the Board affirmed, that these subsequent campaign materials cured any impact that the misstatement in the "Bombs Away" brochure might have had.

■ Although we deplore the Union's prominent use of a misstatement of law, with the mischief compounded by the use of a Board document that easily could be misunderstood as supporting the misstatement, we are mindful that our role as a reviewing Court is not to say what we would have decided had we been in the shoes of the Board. Since the Board's conclusions have support in the record and have a reasonable basis in law, we are constrained not to disturb them.

## IV. Coercive Acts

The Company also alleges that several incidents during the campaign created an atmosphere of fear and coercion which vitiated the employees' right of free choice in the election. Three of the alleged incidents were credited by the ALJ, but he found them insufficient to warrant setting aside the election.

One of the incidents involved employees Dennis Phillipi and Gary Daiker. Daiker, a Union supporter, gave Phillipi a card to fill out indicating support for the Union. Phillipi did not fill out the card. Phillipi and Daiker both attended a Union meeting on January 23, 1980. Both were drinking at the meeting. During the meeting, Daiker called across the room to Phillipi, "Hey Phillipi, are you going to sign a card now?" Transcript at 132. At that point, Richard McLellan, who was standing by Phillipi, handed a card to Phillipi who then signed and returned it. After the meeting, Daiker and about four other employees approached Phillipi in the parking lot outside the Union hall. Daiker approached Phillipi, poked a finger in his chest and said "he better have meant it by signing that card." *Id.* at 135. The other employees made no physical gestures but also said that they hoped Phillipi meant it by signing the card. The parking lot was dark at the time. The incident took no more than two or three minutes. Daiker and Phillipi did not speak again prior to the election, nor did any other pro-Union employees importune Phillipi prior to the election. Phillipi reported the incident to the Company's personnel manager, but does not appear to have discussed it with anyone else during the campaign.

Phillipi also testified that he had had a "run-in" at work with Daiker about a year prior to the election, when Daiker shot a paper clip into his back. A brief, unfriendly discussion ensued and the incident was quickly over with no further physical contact between the parties.

Another incident cited by the Company involved several letters sent by the Union to supervisors of the Company. These letters inaccurately implied that criminal penalties could be imposed against supervisors should any unfair labor practices be committed. When these letters were received, the supervisors were summoned to a meeting with an attorney for the Company, who told them the true state of the law.

The final incident alleged to contribute to an atmosphere of fear and coercion oc-

curred when employee Richard McIvor approached supervisor Jack Schauls and told him to "walk the middle of the road" during the election campaign, and that the Union would "try to get rid of some of the troublemakers" if it were to win the election. *Id.* at 157.

Thus, three coercive incidents occurred during a two-month campaign. Only one was directed against an employee eligible to vote in the election. The other two incidents were directed against supervisors, and the supervisors involved admitted that the incidents did not deter them from campaigning against the Union. Indeed, the supervisors continued to speak out against the Union during the campaign. The ALJ, after hearing extensive testimony on these incidents, determined that they did not warrant setting aside the election.

With respect to the Daiker-Phillipi encounter, the ALJ found that this was nothing more than "a tipsy union supporter who was simply, but crudely, trying to hold Philippi to his apparent commitment to the Union." ALJ's Opinion at 14. The ALJ found that this was an isolated incident which occurred early in the campaign, was not repeated, and was not widely known among the employees. The ALJ concluded that the incident had no significant impact on the election.

Regarding the letters to the supervisors, the ALJ found that any adverse effect on efforts by the supervisors to defeat the Union was neutralized by the actions taken by the Company to correct the misstatement regarding penalties for unfair labor practices. With respect to the McIvor-Schauls incident, the ALJ found that the incident was not widely known among the employees. Moreover, the ALJ observed that it was highly unlikely that any supervisor would believe that support for the Company could cost him his job.

In keeping with the decision of this Court in *Bauer I,* the ALJ considered the totality of the circumstances in determining whether a fair and free election was held. He concluded that the conduct herein of the Union and its supporters did not approach the severity of the conduct condemned in cases such as *NLRB v. Van Gorp Corp.,* 615 F.2d 759 (8th Cir.1983), and *NLRB v. Payless Cashways Lumber Store of South St. Paul, Inc.,* 508 F.2d 24 (8th Cir.1974), and that the record in this case falls short of showing that the conduct in question had created "an atmosphere of fear and reprisal such as to render a free expression of choice impossible." *NLRB v. Griffith Oldsmobile, Inc.,* 455 F.2d 867, 870 (8th Cir.1972).

We cannot say that these findings of the ALJ, affirmed by the Board, lack support either in the record or in law. Nevertheless, we are disturbed by the acts of intimidation that occurred during the election campaign, and we wish to make clear our disapproval of this kind of conduct. In a representation election, neither the employer nor the union can be allowed to engage with impunity in conduct that would subvert employee free choice. Both the Board and reviewing courts must be vigilant in protecting the right of workers freely to choose or to reject a union. As we have said on another occasion, "[u]pon a sufficient showing that employee freedom to exercise meaningful choice has been undermined, by whatever means, we are prepared to set aside the results of [an] election ...." *Nabisco, Inc. v. NLRB,* 738 F.2d 955, 958 (8th Cir.1984).

The facts of this case are troubling, but for the reasons set forth above we enforce the order of the Board.